ROBERT J. GADDIS, APPELLEE, V. SCHOOL DISTRICT OF THE CITY OF LINCOLN ET AL., APPELLANTS.

FILED DECEMBER 24, 1912. No. 17,828.

1. School Districts: GOVERNMENT. By the school laws of Nebraska (Comp. St. 1911, ch. 79), two distinct forms of school-district government are provided for; that of school districts in incorporated cities having more than 1,500 inhabitants being by boards of education and representative in form, while that of the ordinary district in the country and in smaller cities and villages is democratic in form.

2. ———: ———: RURAL DISTRICTS. The ultimate control of the rural

school district resides in the electors, and is exercised at annual or special school meetings; and the directions of the voters as to school buildings and sites must be carried out by the directors strictly within the limits of the powers conferred upon them at the school meeting.

3. ———: ———: CITY DISTRICTS. In city districts which are governed by boards of education, the powers of the district reside in the board of education, and there are no more limitations upon the authority of the board to select school sites and erect school buildings than are placed, in a rural district, upon the electors present at the school meeting.

4. ———: SELECTION OF SCHOOL SITES. Since the repeal of the proviso to section 23, subd. XIV, ch. 79, Comp. St. 1891, there is no requirement that the question of the selection of school sites or the erection of school buildings be submitted to the electors of a city district in order to authorize the board of education to purchase sites and erect buildings.

5. ———: POWERS OF BOARD OF EDUCATION: SCHOOL SITES AND BUILDINGS. Except as limited by the statutes restricting the amount of taxes that may be levied, and the provisions regulating the borrowing of money by the issuance of bonds, the board of education has full power to administer the affairs of the school district as to school sites and buildings.

6. ———: ———: ERECTION OF BUILDINGS: FUNDS. There is no prohibition in the statute against a board of education of a city district, such as the city of Lincoln, from adding money derived from taxation to money obtained from issuing bonds voted for building purposes in order to pay for the erection of school buildings, if in the discretion of the board it deems it for the best interest of the district so to do.

7. ———: ———: FUNDS: LEVY. The direction in section 23, subd. XIV, ch. 79, Comp. St. 1911, is that the board of education shall estimate the amount of money necessary for the support of schools, the purchase of school sites, the erection of school buildings, the payment of interest, and the creation of a sinking fund, and report the same to the county commissioners for levy. There is no distinction made between the collection of money for the support of schools and money for sites or buildings derived from the estimate and levy. The tax is levied in gross for the whole amount of money required as shown by the estimate. The amount levied is equally subject to anticipatory use for all purposes named in the estimate. *School District v. Stough*, 4 Neb. 357; *State v. Sabin*, 39 Neb. 570; *Andrews v. School District*, 49 Neb. 420; *Pomerene v. School District*, 56 Neb. 126, distinguished.

8. ———: ———: Contracts for Buildings: Injunction. Where the amount of money required in a contract made by the school district of the city of Lincoln for the erection of certain school buildings does not exceed the amount of money on hand derived from the sale of bonds issued for building purposes, together with the amount of an estimate for building purposes made by the board of education, and a levy of taxes for that purpose made by the county commissioners for the current fiscal year, the contract will not be enjoined at the suit of a taxpayer as being *ultra vires* and void, because all the money is not in the treasury when the contract was made.

9. Injunction: Costs. Where, at the time a contract for the erection of school buildings was entered into, it was in excess of the powers of the board of education to make, and where by mutual agreement the contract was subsequently modified so as to bring it within the authority of the board of education, the modified contract will not be enjoined upon the ground that it is *ultra vires*. But, since the modification was made after the action was begun, the costs in the district court are taxable to the defendant.

APPEAL from the district court for Lancaster county: P. JAMES COSGRAVE, JUDGE. *Reversed.*

*Mahoney & Kennedy, C. S. Allen* and *Tibbets & Anderson,* for appellants.

*Burr, Greene & Greene, contra.*

LETTON, J.

This is an action by a taxpayer to enjoin the board of education of the city of Lincoln from carrying out a contract with the defendant F. P. Gould & Son for the erection of certain schoolhouses, and from paying the contractor any sum upon the contract, for the reason that the contract price exceeds the amount authorized for building purposes, and is in excess of the money and funds on hand at the time of the execution of the contract, that the construction of the Vine street school building contracted for was not authorized by a vote of the electors, and that the contract does not provide for the completion and furnishing of the buildings as voted by the electors, and,

therefore, is unauthorized, *ultra vires,* and void. The contract as originally made provided for the erection of a high school building and two grade school buildings. The price for each was separately fixed. The total amount payable in any event was $546,973, and provision was made so that the absolute liability, if certain options as to material were exercised by the board of education, would not exceed the sum of $493,683. By mutual consent the contract was afterwards modified by eliminating the provisions concerning one of the grade school buildings, so that at the time of the hearing the utmost liability of the district thereunder was $451,837, with optional reductions as stated. The district court found that the contract was void, and granted an injunction as prayed in the petition. Defendants have appealed.

The stipulation of facts agreed upon shows that, at the election which was held to authorize the issuance of bonds, a choice of locations as to the site of the high school building was submitted to the voters, and that as to the bonds the ballot permitted the voters to express themselves for or against "the $350,000 bonds and taxes (1) for erecting, constructing, finishing, furnishing and completing a high school building or buildings to be located on the place and upon the site to be selected by the electors at said election; (2) for erecting, constructing, finishing, furnishing and completing one grade school building (omitting description of location); (3) for erecting, constructing, finishing, furnishing and completing an annex to the Saratoga school, located on block 2, Cottage Grove addition to the city of Lincoln." Before the contract was let the bonds had been sold, and $362,860.61 had been paid into the treasury from the proceeds thereof, out of which sum $3,000 had been paid before letting of the contract. In June, 1912, the board of education submitted to the county commissioners its annual estimate, and included therein the sum of $100,000 for the purchase of real estate and new buildings. The county commissioners levied a tax of 32 mills for maintenance of schools, purchase of

sites, and construction of buildings, which according to the valuation of property in the district, would produce the sum of $13,306 in excess of the amount estimated. There was $41,045 on hand from the gross revenues of the preceding year. No contract for heating, plumbing, and furnishing has been let, nor will such contracts be entered into until the present contract is completed. The estimated cost of plumbing, heating and furnishing for the three buildings is $195,000. The annex to the Saratoga school has been constructed and paid for out of funds derived from 1911 taxes. The contract provides that the time limit for the completion of the Bancroft school shall be the 10th of August, 1913, and for the high school building, February 10, 1914. The architect testifies that if the work on the high school building is prosecuted with such diligence as would complete it on the date fixed in the contract, taking into account the reserved estimates, only about $200,000 would become payable on the contract on or before July 1, 1913, and if the Bancroft building is completed by the date fixed, August 10, 1913, the amount that would be due and payable would be $75,000. These seem to be the essential and determining facts in the case.

It is the contention of plaintiff that no authority is conferred upon the board of education to purchase school sites and erect buildings, unless authorized to do so by a vote of the electors of the district; that if by such vote the board has been authorized to issue bonds for the purpose of erecting, finishing and furnishing certain school buildings, it is beyond its power to enter into a contract to pay for the same more than the amount of money realized from the sale of the bonds on hand at the time the contract is entered into. In support of this contention he cites the case of *School District v. Stough*, 4 Neb. 357, which was an action by the assignee of certain school orders. The facts in this case were that the district was an ordinary country district, and that no authority or direction was given to the school board by the electors of

48

the district to build a schoolhouse or to let a contract therefor. At the previous school meeting a tax of 5 mills on the dollar had been levied for the purpose of building a schoolhouse. The board assumed that this gave it authority to act. It made a contract for the erection of a school building, issued orders upon the treasurer for the whole amount of the contract price, and delivered the same to the contractors in advance of any work, taking back a bond to secure the faithful performance of the contract. The contractors negotiated the orders the day after they were presented to and accepted by the district treasurer, and never built the schoolhouse. The court held that the orders were not negotiable and did not estop the school district as against a *bona fide* holder for value from availing itself of any defenses in the action which it would have had in an action brought by the original payee. After stating the facts, it said: "On these facts we are well satisfied that the school district is not liable on these orders." This disposed of the case, was all that was necessary to say, and all that was essential to the decision. But, Judge LAKE, writing the opinion, proceeds to say that the district board may not issue orders upon funds not collected, in order to evade the statutory provision that the "'school district shall have power and authority to borrow money to pay for the sites for schoolhouses and to erect buildings thereon, and to furnish the same by a vote of a majority of the qualified voters of said district present at any annual or special meeting.' But, in whichever way the building fund is raised, it is entirely beyond the control of the district board, except for safe-keeping, until the electors of the district, legally assembled, shall give directions as to how it shall be expended," and, hence, that the action of the board was without authority. While not essential to the decision, the rule thus announced was a wise and salutary one, especially at such an early period in the history of the state, when thousands of schoolhouses were yet to be built. Paragraph 3 of the syllabus is as follows: "Contracts for

the erection of a schoolhouse should be made with reference to the funds in the treasury for that purpose. The district board have no authority to draw orders in payment thereof, on a fund which has been proposed, but not raised by taxation." And it is on this proposition that plaintiff makes his main contention. Other cases cited by plaintiff as following the *Stough* case will now be examined.

In *Gehling v. School District,* 10 Neb. 239, the court merely holds that, where the electors at the school meeting authorized the board to expend $20,000 in the building of a schoolhouse, the board had no authority to contract in excess of this amount, saying: "Not only is the authority to direct and control such expenditures withheld from the school board, but as we see is expressly entrusted to the whole body of the electors, by whom alone it can be exercised."

*State v. Sabin,* 39 Neb. 570, was a mandamus suit to compel the school district treasurer to pay an order, dated in 1889, and payable in March, 1891. The contract was made in July, 1889, and provided that payment should be made by orders drawing interest and payable a long time in the future. The court say: "This was directly issuing evidence of indebtedness against the school district due respectively in six, twelve, and eighteen months from date. * * * If evidences of indebtedness of the nature of that sought to be enforced in this action are to be held valid and binding, it will render wholly inoperative and useless the provisions of the statute regulating and restricting the issuance of bonds by school districts."

*Pomerene v. School District,* 56 Neb. 126, was brought to recover on the same contract as was involved in the *Sabin* case. The court held that both the time warrants and the contract were void; the warrants on the grounds stated in the *Sabin* case, and the contract because it provided for payment in illegal warrants.

*Andrews v. School District,* 49 Neb. 420, was an action brought to recover upon certain orders issued under a

contract made in 1888. The orders were payable in 1891. The court followed the *Sabin* case, and held that the school orders were void, but held that under the facts alleged in the petition recovery might be had upon the contract.

*Markey v. School District,* 58 Neb. 479, was also an action upon school orders payable at a future date; the contract being made in 1886 and the orders payable in 1890. In the opinion it is said: "School district officers can contract for the furnishing of schoolhouses only with reference to money on hand and at the time available for that purpose. The officers of the school district possessed no authority to make a contract or give a district order payable at a future time." This was a rural district.

*Zimmerman v. State,* 60 Neb. 633, merely holds that a school board, which at the time it was ordered to remove the schoolhouse had enough money on hand to pay the expense of removal, could not, a year later, justify itself by showing that it had not sufficient money on hand to move the schoolhouse and pay current expenses. It was held that, when a levy for these had been made, the fund might be drawn upon, even though not collected. It is said that the *Stough* case was correctly decided, but did not furnish a precedent in this case.

*School District v. Randolph,* 57 Neb. 546, follows the *Gehling* case in holding that in rural school districts the qualified electors at school meetings have the sole power to determine as to the erection of a schoolhouse and the extent of the expenditure to be made therefor.

*Ladd v. School District,* 70 Neb. 438, holds that a school board may not purchase a school site, unless authorized by the electors at a school meeting.

From this examination it appears that, in the only cases (*Andrews v. School District, State v. Sabin,* and *Pomerene v. School District, supra*) which involve school districts in cities in which boards of education are the governing body and in which no school meetings are provided for, the only matter in issue was with respect to the

validity of school orders made payable at a period long in the future, and issued when no levy had been made in order to provide a fund wherewith to pay the same. The question raised in this case as to whether boards of education in the school districts provided for by subdivision XIV, ch. 79, Comp. St. 1911, may lawfully make such a contract as this is still open. It is true some unguarded expressions have been used, particularly in the *Andrews* case, where the matter was not at issue and where the provisions of the particular statute involved here were not considered, but the questions here are new and must be determined from a consideration of the statutes bearing upon the subject.

A chronological examination of the statutes in this respect affords light upon the problem. The first act relating to common schools in the territory of Nebraska was passed in 1855. 1 Complete Session Laws, p. 89. Under the plan of organization provided thereby, the corporate power of the district resided in the electors assembled in school meeting, a board of three directors being elected at that time to carry out, as agents of the district, the powers conferred upon them at the meeting. The organization of the corporation was substantially the same as that provided for schools in rural districts at the present time. A new statute, differing mainly in matter of detail, was passed in 1856. 1 Complete Session Laws, p. 231. In 1858 (1 Complete Session Laws, p. 559) the latter act was repealed, and a new act was passed which created township districts, and placed the management and control of the same in the hands of a board of education. This is the first instance in the legislative history of the territory of the creation of a board of education as distinct from a board of directors. This act provided for the creation of subdistricts, and the election of a board of three directors in each subdistrict. These local directors were vested with similar powers with relation to schoolhouse sites and buildings as held by directors under the former acts, but their powers and authority in respect to such

matters were derived from the township board of educa-
tion, and not from the electors at a local school meeting.
The act provided, in section 12, that the board of educa-
tion had full power "to build, repair, and furnish the
necessary schoolhouses, purchase or lease sites therefor,
or rent suitable schoolrooms, and make all other neces-
sary provisions relative to such schools as they may deem
proper." By section 21 it was the duty of the township
board of education to make annually estimates of the
amount of money necessary for the support of the schools,
and certify the same to the county clerk, who should assess
the same upon the taxable property of the township. By
section 22 the board had power "to estimate separately
the cost of purchasing a schoolhouse site and erecting or
repairing a schoolhouse thereon, in any particular sub-
district of the township,  *  *  *  which amount so cer-
tified shall be assessed by the county clerk on the prop-
erty therein subject to taxation and placed on the county
duplicate, specially to be collected and paid over in the
same manner as other school taxes, and be applied for the
specific purpose of providing a schoolhouse in the sub-
district." By section 30 of the same act each city or in-
corporated village which, with the territory annexed,
contains not less than 300 inhabitants was created a
separate school district. And it was provided that three
persons should be elected in such city district who should
constitute the members of the board of education of such
district, and who should have the same powers and per-
form the same duties as a township board of education.
This act seems to change the plan of government, and to
take away all power from the school meeting, except to
elect directors.

The next act of any importance seems to have been
passed in 1866. 2 Complete Session Laws, p. 118. It
changed the title of the "township board of education"
to that of "precinct board of education." It retained in
the board of education the powers which they possessed
under the former act, conferred certain limited powers

as to central or high school districts in the precinct, but made no change as to the powers of the board of education in city or village districts.

In 1867 by "An act for the revision of the school law" (2 Complete Session Laws, p. 380), a return was made to the system of school districts governed by school meetings, and all powers respecting school sites and buildings were conferred upon the qualified voters in meeting assembled.

In 1869 a new act was passed, entitled "An act to establish a system of public instruction for the state of Nebraska." 2 Complete Session Laws, p. 448. This act, with but a few changes, has been carried forward into our present statutes with respect to the organization and government of rural school districts. It may be said that few of the former acts contain any repealing clause, but this repealed the act of 1867, and all other acts and parts of acts inconsistent with this act.

In 1871 a special act relative to schools in the city of Omaha was passed. 2 Complete Session Laws, p. 608. This act created a board of education with like powers to those possessed by the boards of education in city and village districts under the former acts. It contained, for the first time, provisions authorizing the board of education to issue bonds if necessary for school sites or buildings, with the proviso that no bonds should be issued without the consent of two-thirds of the board of education, and that if the bonds desired should exceed in amount the sum of $15,000 the question of their issuance should be submitted to the electors at a special election.

In 1872 a special act for the government of the schools of Nebraska City was passed (2 Complete Session Laws, p. 640) which constituted the mayor and common council commissioners of the schoolhouse fund, and conferred upon them "all the rights, powers, and authority necessary for the purpose of raising money for erecting, purchasing, or leasing schoolhouses, and procuring sites therefor, and fitting up and furnishing thereof." Sections

4 and 5 of this act are substantially the same with respect to the duties of the commissioners in purchasing sites and building schoolhouses as provided in the Omaha act.

In 1873 a general act was passed, entitled "An act relative to public schools in cities of the first class." 2 Complete Session Laws, p. 698. The same powers and duties with respect to schoolhouses and sites, and the same limitation with respect to the issuance of bonds, are contained therein as ' in the former acts relating to Nebraska City and Omaha, with the further provision that, if the purchase of sites and the erection of buildings require the expenditure of more than $15,000 for any one calendar year, the question shall be submitted to a vote of the electors, and the board of education shall, previous to such election, designate in at least one daily paper published in the district the locality of the site. or sites required and the cost of the building to be erected thereon.

In 1875 (2 Complete Session Laws, p. 885) a similar act was passed relative to cities of the second class, but omitting the provision that the question of expending more than $15,000 for schoolhouses or sites be submitted to the electors.

In 1881 an attempt was made to revise and codify the entire system of school laws into one comprehensive statute. An act was passed, entitled "An act to establish a system of public instruction for the state of Nebraska." Laws 1881, ch. 78. This act, as amended from time to time, is now in force. The first five subdivisions provide for the organization of school districts according to the town meeting plan, except in cities and villages with more than 2,000 inhabitants (now 1,500), and substantially as provided in the act of 1869. Other subdivisions provide for the organization of country high school districts; the qualifications of teachers for normal schools; for the distribution of state school funds, etc. The fourteenth subdivision, which is applicable to the school district of Lincoln, provides for the organization and administration of schools in all incorporated cities having

a population of more than 1,500, and leaves the powers and duties of the board of education practically as they were in the act of 1873. This act specifically repeals the acts of 1867, 1869, 1871, 1873, 1875, and all amendatory acts.

In 1893 the proviso that, in case the purchase of sites and erection of buildings for any one calendar year requires the expenditure of more than $5,000, the question shall be submitted by a notice specifying the locality of the site required and the cost of the proposed building was stricken out by amendment. Laws 1893, ch. 31. This left the question as to the issuance of bonds the only matter as to which the board of education is bound to take a vote of the electors.

The provisions of section 4, relating to ballots for the purchase of sites and erection of buildings, clearly apply to the repealed proviso, and are like the splint bones in a horse's leg, or the hidden and rudimentary legs of some snakes, merely evidence of a discarded function. The argument based upon section 4, therefore, must fail.

From this survey of the course of legislation in the territory and state, it is apparent that two systems of school administration have existed side by side for more than half a century; one vesting the control of the corporation in the electors at the school meeting, and the other making the board of education the governing body. The act of 1873 (Gen. St. 1873, ch. 69), relative to schools in cities of the first class, provided in section 4: "That the affairs of the school district hereby created shall be conducted exclusively by boards of education, except as otherwise provided by this act." This thought is carried forward into section 1, subd. XIV, of the present act (Comp. St. 1911, ch. 79) in the following language: "The board of education, by this subdivision provided, shall have exclusive control of the same (all property of the district) for all purposes herein contemplated." Under the subdivisions relating to country districts, their government and control is almost a pure democracy, while

as to city districts the plan of government by boards of education is representative in form, limited only by the provision for a referendum to the electors on the question whether money shall be borrowed, by the issuance of bonds, for school sites and the erection of schoolhouses. The powers which under the one plan are conferred upon the electors, are by the other conferred upon the board of education. Since the proviso was repealed, there are no more limitations upon the powers of the board of education, to select school sites and erect school buildings, to be found in the statutes, than are placed, in a district organized under the other form, upon the electors present at the school meeting. The board, therefore, possesses all the powers of the electors themselves, except that, if money becomes necessary for the purchase of sites or the erection of buildings in excess of that which may be raised by direct taxation, the question of whether bonds may be issued must be submitted to the electors under section 24. If no bonds are necessary, a board of education with the powers of that of the city of Lincoln may select and purchase sites and erect school buildings thereupon by money derived from taxation. This seems to be the view taken in other states as to the powers of such boards under similar statutes. *Gunnison v. Board of Education,* 176 N. Y. 11, 17, 25; 35 Cyc. 832, note 80; 25 Am. & Eng. Ency. Law (2d ed.) p. 54.

This conclusion as to the power and authority of the board of education disposes of the contentions that the contract is void for the reasons that the contract price exceeds the amount authorized by the electors for building purposes; or because the construction of the Vine street building was not authorized by a vote of the electors; or for the reason that the contract is not in accordance with the authorization of the electors, in that it does not provide for the completion and furnishing of the buildings, and that a further large expenditure will be required for plumbing and heating.

The only question left for consideration is whether the

contract is void because the amount agreed to be paid exceeds the money and funds on hand at the time that the contract was made. As we have seen in our review of the cases, this exact question has never been decided so far as concerns a city district, though it has been assumed that the holding as to rural districts applied. The only provisions of the statute controlling the board of education as to this question are to be found in sections 23, 24, subd. XIV, ch. 79, Comp. St. 1911, and, so far as applicable, are as follows: Section 23. "That the board of education shall annually, during the month of June, report to the county commissioners an estimate of the amount of funds required for the support of the schools during the fiscal year,  *  *  *  the erection of school buildings, the payment of interest upon all bonds issued for school purposes, and the creation of a sinking fund for the payment of such indebtedness; and the county commissioners are hereby authorized and required to levy and collect the necessary amount the same as other taxes." Section 24. "That the aggregate school tax, exclusive of school bond taxes, shall in no one year exceed 35 mills."

The direction in section 23 is that the board shall estimate the amount of money necessary for the purchase of school sites, and the erection of school buildings, as well as the money needed for the support of schools, the payment of interest, etc. There is no distinction made between the collection and expenditure of money derived from the same levy for the support of schools, and money to be used for sites and buildings. When the amount required for all school purposes is certified to the county commissioners, they ascertain the percentage, and make the levy necessary to produce the money called for, in gross, and as a general fund. There is no provision in the statute for making distinct levies for each of the many purposes for which the estimate is made and the money required. The tax is levied for the whole estimate and the collector places it all in the same fund. It is presumed that the board will follow the estimate in expend-

ing the money, and perhaps it may be required to do so, but this we do not decide. Moreover, if any benefit from the levy is to be had during the fiscal year next ensuing, it must be subject to anticipatory use for all the purposes mentioned in the estimate. The exact question here is not whether the board may issue warrants upon the current levy, but it is whether the board may lawfully enter into a contract upon which it may become necessary at some time in the future to make payments, at a time when, although the levy has been made, the money has not all been actually collected. The fund being general, and there being no distinction in the law between money levied and collected for building and that for other purposes, we are convinced that the board has power to contract upon the basis of the levy, and before the taxes are collected. *School District v. Fiske,* 61 Neb. 3. The other opinions in *Fiske v. School District,* 58 Neb. 163, 59 Neb. 51, merely decide that the board of education of the city of Lincoln had power to contract for plans for a school building, even if the doctrine of the *Stough* case, *supra,* applied as to the erection of the building itself.

Coming now to the facts: When the contract was let, $359,860 was in the treasury from the sale of bonds and $41,045 from the gross revenue of the previous year, so that $400,905 was actually in the treasury at that time. The contract provides for the payment of $336,622 for the erection of the high school building and $115,215 for the erection of the Bancroft building, so that the total amount required to make the payments under the contract is $451,837, as against $359,860 on hand from the proceeds of the sale of bonds and $113,306 available from the proceeds of the levy outside of that required for other than building purposes. This exceeds the amount payable under the modified contract by several thousand dollars.

As to the contention based upon the fact that the proposal as to the issuance of bonds when presented to the voters contained specifications as to the manner in which the board purposed to expend the money: As we have

seen, no statute makes this a condition to the exercise by the board of its duties in providing school buildings. The result of the submission must be considered, therefore, obligatory as a limitation of the power to issue bonds, and advisory as to the manner of their expenditure. If in good faith the board is attempting to carry out the main purpose for which the bonds are voted, no one is entitled to interfere with its discretion as to details. The money raised by the bond issues may be used, as far as it goes, in carrying out the purpose of the board, but we know of no reason why it may not be added to by money derived from other sources if the necessities of the district require. *McCavick v. Independent School District,* 25 S. Dak. 449.

The stipulation recites: "That the three school buildings proposed to be constructed by said contract are needed for immediate use in said school district; that there are now 375 pupils more than can be accommodated in the present buildings of the defendant; that the school district is compelled to use and does use rooms in store buildings and basements for schoolrooms, and that half-day sessions are general in the lower grades; that at the beginning of the present year there was an increase in the enrollment of 335 pupils, in the grades alone, over the enrollment of the preceding year, which increase is of itself sufficient to fill a grade building of the size contemplated in said contract; that a large number of the present buildings are very old and unsanitary, poorly lighted, and with no system of ventilation; and, while the cost of the new buildings is a considerable sum, it is the lowest figure for which the actual necessities of the public schools of this district can be supplied."

The plaintiff is here seeking the extraordinary writ of injunction against the officers of the school district, to restrain what he asserts to be both a public and private wrong. The presumption is that the officers acted within their authority and did not transgress its scope, and the burden is on the plaintiff to disclose facts which will

justify the court in the issuance of the writ. Nothing should be left for inference.

We are of the opinion that the contract, as modified, is within the power of the board of education to make, and the judgment of the district court is, therefore, reversed. Since, however, when the action was begun, the contract price for all three buildings exceeded the money on hand and available, the costs of the action in the district court were properly taxed to the defendants.

REVERSED.

HAMER, J., not sitting.